# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

FILED

May 16 2013, 8:23 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JASON LEE SOWERS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 08A02-1208-CR-640 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CARROLL CIRCUIT COURT
The Honorable Donald E. Currie, Judge
Cause No. 08C01-1108-FC-16

**May 16, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Jason Lee Sowers appeals his convictions for criminal recklessness as a class D felony, resisting law enforcement as a class D felony, and his adjudication as an habitual offender. Sowers raises two issues, one of which we find dispositive and restate as whether the communication between the bailiff and the foreperson resulted in fundamental error. We reverse and remand.

FACTS AND PROCEDURAL HISTORY

Terri Dean, Sowers's mother, started noticing that Sowers, who was born on November 29, 1976, was experiencing mental health issues in the middle of 2005. Sowers's mental health condition, personal hygiene, and finances worsened. In September 2008, Sowers "took a swing" at his brother, and Dean called the police. Transcript at 222. Sowers was in jail for seven days and then transferred to the Kokomo Mental Hospital and placed on a psychotic drug called Risperidone, which is a time released medication and is administered every two weeks. The medication helped, and Sowers switched from injections to pills about six months later.

In April or May 2010, Sowers's behavior started to change and his personal hygiene declined to the extent that he would go weeks without a shower or washing his hair. Dean discovered that Sowers had quit taking his medication. She began visiting Sowers three times a day. In April 2011, Dean contacted the Frankfort Community Counseling Center and asked for assistance but was unable to receive any help.

On June 30, 2011, one of Sowers's friends sent a text message to Dean and told her that Sowers was "talking strange, and look[ed] strange," and that the friends were very uncomfortable. Id. at 232. Dean, her husband, Sowers's cousin, and two brothers

2

waited until Sowers was asleep, and then forcefully picked him up, and transported him to the St. Vincent Frankfort Hospital Emergency Room. Dean alerted the police that they were taking Sowers to the hospital, and about seven law enforcement officers showed up to help transport him into the hospital. Sowers refused to allow the emergency room personnel to do anything. An emergency detention order was obtained, the hospital gave him a shot, and Sowers was transferred to Howard Regional Mental Health Center in Kokomo.

On July 8, 2011, the Clinton Superior Court entered an order of temporary commitment following the emergency detention which found that Sowers was suffering from "schizo-[a]ffective and bipolar disorder," was gravely disabled, and was in need of commitment to an appropriate facility for a temporary period not to exceed ninety days. Defendant's Exhibit W. Sowers was taken to Howard Regional Health System and was given an injection of Risperidone. From Dean's observations in the past when Sowers was on the medication, she was aware that it "usually took about three shots going towards the fo[u]rth one before he really leveled out." Transcript at 238.

On July 10, 2011, a counselor called Dean and told her that Sowers was going to be released the next day. Dean told the counselor that she thought it was too soon to release Sowers, that she knew it took three doses of medication "really close to the fo[u]rth one coming before he was safe to be around and if she released him the next day she was setting him up and everybody else around him up for a disaster because he wasn't ready." Id. at 239. Howard Regional Health System released Sowers on July 11, 2011.

3

The second shot was supposed to take place at the Frankfort Community Counseling Center on July 21, 2011. Dean went over to Sowers's residence and told him that he needed to shower and to go to the clinic for his second shot, and Sowers told her that he would drive himself. Dean later called the clinic and discovered that Sowers had not received his second shot. Dean returned to Sowers's residence and asked him why he did not go for his second shot, and Sowers was very agitated and said that they made him mad. Dean tried to take Sowers to the clinic but was unable to take him. She returned to Sowers's residence that night, and he became "mean to where [Dean] was fearful of him." Id. at 245.

Dean did not initially contact the court because she was under the impression that it was the clinic's responsibility. On the following Thursday, Dean called the court reporter for the judge that entered the order of temporary commitment, and she was told that she needed to call the clinic and that the clinic was ordered to let the court know if Sowers did not appear for shots. Dean took that step but nothing happened. Dean's husband was concerned and made her turn her cell phone on, place it in her pocket, and leave it on when she went to Sowers's residence.

A friend of Sowers called Dean and told her that Sowers had followed her home from work and made her very uncomfortable and that if he continued that she was going to have to put a restraining order against him. That Friday, Dean went to Sowers's residence, and Sowers met her at the door. Dean asked Sowers why he followed his friend, and Sowers denied it and slapped Dean and told her it was time to go. Dean left and returned later to offer Sowers lunch and dinner.

4

On August 1, 2011, Sowers entered Dean's residence and Dean saw that he had the "most horrific look in his eyes." Id. at 252. Sowers told Dean that he had a flat tire, and Dean started to stand up from her chair, but Sowers forcefully put himself right in front of her and told her that he did not need her help and called her "some not so nice names" and said some "pretty rude nasty things." Id. Dean told Sowers that he needed to leave because she was scared. Sowers left in his vehicle and Dean noticed that one of the tires was completely "gone." Id.

Dean locked the door and called the clinic and explained that the situation had become very desperate. A nurse at the clinic called Dean back and stated that she was "so sorry that they hadn't helped [Dean] with [Sowers] and had already called the court and they were going to issue [an] emergency detention order then." Id. at 253-254. Dean called the Clinton County Sheriff so that they would understand the situation and said that Sowers was "very, very, paranoid[,] he trusts no one. Whatever you do don't corner him." Id. at 254.

Clinton County Sheriff's Deputy Tim Dillingham was aware of the emergency detention order for Sowers and that Sowers had made threats to family members. Deputy Dillingham was alerted to Sowers's position by another deputy, followed Sowers, and eventually activated his lights and siren. Sowers did not stop and continued through Boyleston and Michigantown. Sowers, who by this time had all four tires fully inflated, eventually sped up and began passing vehicles in no passing zones and was "very close to causing a couple head on collisions in Clinton County." Id. at 113. Two other law enforcement officers in fully marked vehicles joined the pursuit and one of the officers

had a video camera which was activated. At some point, Indiana State Police Trooper Larry Mote attempted to pass Sowers, and Sowers struck the rear panel of Trooper Mote's vehicle and "spun him out." Id. at 118. Trooper Mote's vehicle struck a guard rail, flipped up into the air, went down an embankment, and ended up upside down with all four tires in the air.

Deputy Dillingham continued to follow Sowers, and Sowers abruptly turned into a driveway. Crystal McAninch heard a vehicle pull in her driveway and observed Sowers run out of his car and toward her garage. McAninch then grabbed her son, ran through her garage into her house, and locked the door. Sowers pounded on the back door a couple of times. McAninch's fiancé, Kevin Cawvey, grabbed his shotgun, went to the door to the garage, cracked the door open, and noticed that the garage was pitch black. Cawvey asked McAninch if she had closed the garage door and before she could answer, Sowers stated that he closed the garage door. Cawvey turned on the light and opened the garage door. He asked Sowers why he was in the garage, and Sowers said that there were people chasing him and trying to kill him.

Carroll County Sheriff's Detective Kevin Hammond calmly took Sowers away, and Sowers did not resist physically. He told Detective Hammond that somebody had been chasing him and wanted to kill him and that he did not see any police officers behind him. Deputy Dillingham observed that Sowers was "very distant" with a "very blank stare." Id. at 125. Deputy Dillingham transported him from that location to Howard Regional Hospital in accordance with the emergency detention order.

6

On August 8, 2011, the State charged Sowers with Count I, battery as a class C felony; Count II, criminal recklessness as a class D felony; and Count III, resisting law enforcement as a class D felony. The charges related to the pursuit on August 1, 2011.[1] The State later alleged that Sowers was an habitual felony offender as Count IV.

On August 26, 2011, Sowers filed a notice of defense of mental disease or defect. On August 29, 2011, the court ordered that Sowers be evaluated by two psychiatrists or psychologists. On December 28, 2011, Dr. Lori Rogers filed a report which concluded that Sowers appeared to meet the criteria for insanity and that he was not criminally responsible for his actions that led up to his arrest on August 1, 2011, due to his severe delusional thinking. On January 19, 2012, Dr. Vernon Little filed a report with the court which concluded that Sowers is schizophrenic, experiencing a severe chronic mental illness, that "at the time of the arrest, his ability to ascertain reality from his own delusional thinking was profoundly deficient," and that "he was legally insane at the time of the alleged offense." Court's Exhibit 1.

Beginning on June 5, 2012, the court held a jury trial. After the State rested, Sowers moved for a directed verdict. Sowers's counsel argued that "there is no evidence, demeanor evidence, lay witness evidence, law enforcement evidence, psychiatric expert evidence, that does not support by a preponderance of the evidence that he was unable to appreciate the wrongfulness." Transcript at 217. The prosecutor argued that the question

---

[1] Count I alleged that Sowers did knowingly touch Trooper Mote in a rude, insolent, or angry manner by means of a deadly weapon, a motor vehicle. Count II alleged that Sowers "did recklessly, knowingly, or intentionally with a deadly weapon, to wit: a vehicle, perform an act, to-wit: flee from Larry E. Mote, run into Larry E. Mote's car, or run Larry E. Mote off the road that created a substantial risk of bodily injury to Larry E. Mote." Appellant's Appendix at 12. Count III alleged that Sowers "did knowingly or intentionally flee from Jill Hammond, Larry E. Mote, or Tim Dillingham . . . ." Id. at 14.

of whether Sowers knew the wrongfulness of his actions was one for the jury. The court denied the motion and stated: "[W]hile the Court is going to find that the [sic] in fact the defendant at this point may have met its burden the Court's not going to find that it in fact has." Id. at 219.

After the defense rested, the court provided the jury with copies of the final instructions. The court also read the instructions and told the jury "you can read along or you can simply listen to the court as the court reads the instructions." Id. at 266. The court gave the following final instruction:

> To return a verdict, each of you must agree to it. Each of you must decide the case for yourself, but only after considering the evidence with the other jurors. It is your duty to consult with each other. You should try to agree on a verdict, if you can do so without compromising your individual judgment. Do not hesitate to re-examine your own views and change your mind if you believe you are wrong. But do not give up your honest belief just because the other jurors may disagree, or just to end the deliberations.

Appellant's Appendix at 57; Transcript at 285.

During deliberations, the jury asked whether the video of the pursuit could be reviewed and the meaning of the word insolent. The court informed the jury that it could not provide a definition of the term insolent and the jury reviewed the video. At approximately 4:30 or 4:45 P.M., the jury foreperson asked the bailiff if she could text her children to let them know that she would not be home as scheduled, and the bailiff told her that she could as long as he could read the message so that he would know exactly what she wrote. The foreperson sent a text message to her children and told them that she would not be released until they reached a verdict.

8

At approximately 6:00 P.M., the foreperson asked the bailiff "if they were to stay and deliberate until they reached a 100 percent agreement with the counts." Transcript at 355. The bailiff stated: "yes as the Judge stated in there you have to be 100 percent in agreement." Id. at 355-356. The foreperson stated "okay" and returned to the jury room. Id. at 356. The jury returned to deliberations and then asked again to review the video. The court played the video again.

The jury found Sowers not responsible by reason of insanity on Count I, battery as a class C felony, and guilty but mentally ill of Count II, criminal recklessness as a class D felony, and Count III, resisting law enforcement as a class D felony. Sowers's counsel asked to poll the jury. When asked whether those were her true verdicts, Juror No. 3 stated: "I have a conscience about it but yes." Id. at 320.

Sowers waived the right to a jury trial with respect to the habitual offender allegation. The court then discharged the jury. The prosecutor asked the jury if he could speak with the jurors to talk about the case. Sowers's counsel indicated that he had other matters immediately after the trial and was not going to be able to talk to them but advised the jury to share their thoughts with the prosecutor. The court then found Sowers to be an habitual felony offender.

The prosecutor informed the court that there was an interaction between a juror and the bailiff. Specifically, the prosecutor stated:

> In the period of time immediately following the release of the jury, not immediately a few minutes after I went back to talk to the jurors, I believe that all 12 of the jurors were still present. Also back in the jury room with me were Deputy Hammond of the Carroll County Sheriff's Department and Master Trooper Larry E. Mote of the Indiana State Police. During the course of my discussion with the jury I asked the jurors if they had any

9

questions for me. A juror that I know to be from the trial proceedings to be Linda Overman, asked me a question, I don't know precisely the phrasing of the question but it was something in the general manner or did we have to reach a verdict? And I explained that criminal jury verdicts must be unanimous however it's not absolutely true that there must be a verdict in that if there's not a unanimous verdict and there's a hung jury after a sufficient amount of time the court would declare a mistrial and the trial would be set off perhaps re-tried. The juror, Linda Overman, expressed unhappiness and said that they had been told and I don't know exactly the phrase she used they had been told that there had to be verdicts. And I asked Ms. Overman if she had put anything in writing and sent a note to the court. I did not recall such a note, she said no she had not. I asked her if she had received any written notes from the court on the subjects. She said no she had not. I asked her if she spoke to anyone about it she said no the foreperson had talked to the bailiff. The foreperson was there, Ms. Mrs. Minier, and Mrs. Minier either said yes she had or she nodded her head that she acknowledged that she had talked to the bailiff. I did not ask Ms. Overman or Ms. Mrs. Minier what the conversation was in large part because I felt that that probably should be done in the context if the defense felt in the context where the parties would be under oath and I did not discuss with them any further to the best of my memory as to what the proper procedure should have been. Except only to express my explanation to Ms. Overman that there did not have to be a verdict in a particular criminal trial.

Id. at 349-350. Upon direct examination by Sowers's counsel, the prosecutor stated that it was his impression that the foreperson took the information from the bailiff back to the jury. The following exchange then occurred:

Defense Counsel: Is it your understanding that once that information was communicated that Mr. [sic] Overman at least took a course of action based upon that information?

Prosecutor: I can't know that she took a particular course of action but her statements gave me the impression that she felt that that was a very important piece of information that that she might have proceeded differently. I can't say exactly how she phrased that.

Defense Counsel: She was in fact the juror that was hesitate [sic] when pulled [sic] following the jury verdict being read?

10

| | |
|---|---|
| Prosecutor: | She is the same person that expressed some question about her conscience when she was originally pulled. [sic] I don't remember exactly how she phrased it but we are talking about the same women [sic] on the jury yes. |
| Defense Counsel: | And your impression was that had that information not been provided to her she would have taken a different course of action or she would have understood different courses of action were available to her? |
| Prosecutor: | The real impression I had was that my explanation that one vote for guilty or one vote for not guilty could hold up to a jury verdict was important to her in that she that was not the way that she had understood what she had been told. |
| Defense Counsel: | Was it your impression that she could not hold out, I mean lack of a better phrase, that she had to make a decision with the jury rather than hold out. Was that your impression? |
| Prosecutor: | Not being able to tell what's in her mind that was the impression that I got from her statements. |

Id. at 352-353.

The court then questioned the bailiff. The bailiff testified that Pam Minier, the person he believed to be the foreperson, asked "if they were to stay and deliberate until they reached a 100 percent agreement with the counts." Id. at 355. The bailiff stated: "yes as the Judge stated in there you have to be 100 percent in agreement." Id. at 355-356. The bailiff also indicated that he did not instruct the jury to put the question in writing and that Minier stated "okay" and returned to the jury room. Id. at 356. The bailiff also was not sure whether the other jurors heard his answer. After Sowers's counsel questioned the bailiff, the court asked the parties whether any further record

11

needed to be made, and the prosecutor and Sowers's counsel indicated that no further record was necessary. The court then scheduled a sentencing hearing.

The court sentenced Sowers to two years for Count II, two years for Count III, and one and one-half years for Count IV. The court ordered that the sentences for Counts II and III run concurrent with each other and that the sentence for Count IV,[2] run consecutive to Counts II and III. The court suspended the sentences for Counts II and III and placed Sowers on supervised probation for a period of two years.

## DISCUSSION

The issue is whether the communication between the bailiff and the foreperson resulted in fundamental error. Sowers argues the communication between the bailiff and the jury foreperson was highly improper and misled the jury. Sowers concedes that he "did not make a real objection, or request a mistrial," and that the issue would normally be waived. Appellant's Brief at 40. However, Sowers argues that the communication by the bailiff resulted in fundamental error. Sowers contends that the denial of his right to an impartial jury is a violation of Article 1, Section 13 of the Indiana Constitution and that the error is fundamental.

The State argues Sowers waived his claim of improper communication with the jurors because Sowers did not object to the bailiff's communication with the juror or move for a mistrial. The State also argues that the error does not fall within the extremely narrow confines of fundamental error. The State contends that the bailiff

---

[2] The trial court erroneously entered a separate sentence for the habitual offender finding to be served consecutive to the sentences for Counts II and III. It is well settled that a habitual offender finding does not constitute a separate crime, nor does it result in a separate sentence. See Ind. Code § 35-50-2-8. Rather, a habitual offender finding results in a sentence enhancement imposed upon the conviction of a subsequent felony. Hendrix v. State, 759 N.E.2d 1045, 1048 (Ind. 2001).

simply referred the juror to the instructions that the court had read to the jury and observes that Final Instruction No. 28 stated in part: "To return a verdict, each of you must agree to it."  Appellant's Appendix at 51.  The State asserts that "[b]ecause the improper *ex parte* communication between the bailiff and the juror resulted only in the bailiff reminding the juror of the court's instruction that the verdicts had to be unanimous, which is simply what the court would have told the jury had a written question been referred to the judge, as would have been the proper procedure, Sowers suffered no harm or prejudice from this improper communication."[3]  Appellee's Brief at 13.

Generally, "[t]o ensure the right of criminal defendants generally to be present at all stages of a criminal proceeding, Indiana courts have often stated that when communication between a bailiff and a jury occurs outside the defendant's presence, there is a presumption of harm to the defendant." Azania v. State, 730 N.E.2d 646, 654 (Ind. 2000), reh'g denied.  "Reversal may be avoided only if no harm or prejudice to the defendant results."  Baxter v. State, 727 N.E.2d 429, 435 (Ind. 2000), reh'g denied. When the trial court has addressed the issue of improper communications, we do not

[3] The State cites Napier v. State, 445 N.E.2d 1361, 1365 (Ind. 1983), in which the Court addressed the defendant's claims that the trial court committed reversible error when, during deliberations, it gave the jury what has been referred to as an "Allen" charge.  The Court had previously explained that an "Allen" charge was "a designation given to a supplemental charge given by a trial judge to an apparently deadlocked jury, [and] is named after the first major case which considered such a charge, Allen v. United States, (1896) 164 U.S. 492, 17 S. Ct. 154, 41 L.Ed. 528." Lewis v. State, 424 N.E.2d 107, 109 (Ind. 1981).  The Court held that to preserve error in instructions one must lodge a specific objection at trial and that absent a timely objection and tender of an alternative instruction, the issue is waived on appeal.  445 N.E.2d at 1365.  The State argues that "[c]onsidering the significance of such an instruction on the jury's deliberations, the fact that our Supreme Court has held that a defendant can waive an instruction telling the jury to continue deliberations for as long as it takes by not objecting provides support for finding that what occurred in the present case did not constitute fundamental error." Appellee's Brief at 14.  We do not find Napier instructive as the Court did not address the issue of fundamental error.

reweigh its determinations as to the credibility of the witnesses.  Id.  Because this is a factual determination, it is subject to a clearly erroneous standard of review.  Id.

The Indiana Supreme Court has held that the "fundamental error" rule is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process."  Boesch v. State, 778 N.E.2d 1276, 1279 (Ind. 2002), reh'g denied.  "When determining whether a defendant suffered a due process violation based on an incorrect jury instruction, we look not to the erroneous instruction in isolation, but in the context of all relevant information given to the jury, including closing argument, and other instructions."  Id. (internal citations omitted).  No fundamental error has occurred "where all such information, considered as a whole, does not mislead the jury as to a correct understanding of the law."  Id.

Initially, we observe that Ind. Code § 35-37-2-6(b) provides that "[a]n officer may not communicate with a juror except: (1) as provided in sections 2 and 4 of this chapter; (2) to ask them if they have agreed on a verdict; or (3) when ordered to do so by the court."[4]  Thus, the bailiff improperly communicated with the jury.

We find Coolman v. State, 163 Ind. 503, 72 N.E. 568 (1904), instructive.  In that case, the defendant was charged with murder in the first degree.  163 Ind. at 504, 72 N.E. at 568.  After the jury had retired to deliberate on their verdict, in the absence of the defendant and his counsel, and out of the presence and hearing of the judge of the court, the foreman of the jury said to the bailiff, who had been called to the door of the room in

_____

[4] Ind. Code § 35-37-2-2 governs the order of the trial and Ind. Code § 35-37-2-4 governs preliminary instructions, admonition by the court, and separation.

14

which the jury were kept, "We can't agree upon a verdict, and have agreed to disagree." 163 Ind. at 509-510, 72 N.E. at 570. The bailiff answered that he would go and see the judge. Id. at 510, 72 N.E. at 570. After doing so he returned to the door of the room and said to the foreman: "The judge says that he cannot receive a verdict of disagreement; that he is going out to his cottage at Shriner Lake, and will not be back until between six and seven o'clock; and that if you agree before that time he will receive the verdict when he returns, and, if you have not agreed at that time, he will receive your verdict when you do agree." Id. The foreman then said to the bailiff, "But we must agree to disagree." Id. To this, the bailiff replied, "Oh, pshaw, Henry!" and closed the door. Id. The jury found the defendant guilty of murder in the second degree. Id. at 504, 72. N.E. at 568.

> On appeal, the Indiana Supreme Court held:

> The conduct of the bailiff in holding a conversation with the foreman, in which he told the latter that the judge could not receive a verdict of disagreement; that the judge was going away to be absent until 6 or 7 o'clock, and would, on his return, receive the verdict if they had agreed, and otherwise he would receive it when they did agree; the remark of the foreman, "But we must agree to disagree;" and the response of the bailiff, "Oh, pshaw, Henry!" – were grossly improper.

Id. at 510, 72 N.E. at 570. The Court also held that the prejudicial effect on the minds of the jury may be conclusively presumed. Id. The Court observed that the jury had been deliberating for twenty hours when the conversation with the bailiff took place and that a verdict was agreed upon two hours later. Id. at 510-511, 72 N.E. at 570. The Court also held:

> The statement of the bailiff to the foreman that the jury could not agree to disagree; that the judge would return between 6 and 7 o'clock to receive the verdict if they did agree, and, if they had not, he would receive it when they did agree – may well have been understood as a warning from the court that

15

no disagreement would be permitted, and that he would keep them together until they did agree. Coming from the judge himself in the courtroom, in the presence of the defendant and his counsel, such a statement would have been improper. Made by a bailiff at the door of the jury room, in the absence of court, defendant, and counsel, and embellished by a contemptuous reference to the possibility of an honest disagreement, it cannot be too severely condemned.

Id. at 511, 72 N.E. at 571.

Here, we observe that the question was not whether the jurors had to reach 100 percent agreement to reach a verdict, but whether "they were to stay and deliberate until they reached a 100 percent agreement with the counts." Transcript at 355. Further, the record reveals that the bailiff's comment was told to the foreperson and shared with at least Juror Overman. The prosecutor stated that Juror Overman "said that *they had been told* and I don't know exactly the phrase she used *they had been told that there had to be verdicts*." Id. at 350 (emphases added). The prosecutor also stated that it was his impression that that the foreperson took the information from the bailiff back to the jury.

With respect to the impact of the bailiff's comment, we observe that Juror Overman expressed unhappiness when the prosecutor informed her that a hung jury and a mistrial were a possibility. Further, the prosecutor stated that Juror Overman's statements gave him "the impression that she felt that that was a *very important* piece of information that that she might have proceeded differently." Id. at 352 (emphasis added). The prosecutor stated that "[t]he real impression I had was that my explanation that one vote for guilty or one vote for not guilty could hold up to a jury verdict *was important to her* in that she *that was not the way that she had understood what she had been told*." Id. at 353 (emphasis added). The prosecutor acknowledged that Juror Overman was the

16

juror that expressed some question about her conscience when she was originally polled. Lastly, the prosecutor indicated that it was his impression from Juror Overman's statements that she had to make a decision with the jury rather than hold out. Under the circumstances, we conclude that the error constitutes a blatant violation of basic principles and that the harm or potential for harm is substantial, and the error denied Sowers fundamental due process.[5] See Driver v. State, 594 N.E.2d 488, 493 (Ind. Ct. App. 1992) (holding that reversible error occurred when the bailiff gave the tape of the final instructions to the jury), trans. denied; Sparks v. State, 154 Ind. App. 691, 692, 290 N.E.2d 793, 794 (1972) (holding that the conversation between the bailiff and the jury constituted reversible error).

CONCLUSION

---

[5] We acknowledge that the court provided the following instruction both orally and in writing:

> To return a verdict, each of you must agree to it. Each of you must decide the case for yourself, but only after considering the evidence with the other jurors. It is your duty to consult with each other. You should try to agree on a verdict, if you can do so without compromising your individual judgment. Do not hesitate to re-examine your own views and change your mind if you believe you are wrong. But do not give up your honest belief just because the other jurors may disagree, or just to end the deliberations.

Appellant's Appendix at 57; Transcript at 285. We also acknowledge that the Indiana Supreme Court relied upon a similar instruction in rejecting a plaintiff's arguments that reversal was required based upon the trial court's response to a juror's question without first informing counsel and that the response created an impression that a hung jury would not be permitted. Henri v. Curto, 908 N.E.2d 196, 200-202 (Ind. 2009). We note that the Court in Henri was addressing a jury verdict adverse to the plaintiff's civil damage claim for rape and in favor of the defendant's counterclaim for tortious interference with his university contract as a result of his expulsion. Further, unlike in Henri, Juror Overman did not merely answer "Yes" when polled after the verdict, but stated: "I have a conscience about it but yes." Transcript at 320. Unlike in Henri in which a juror made a private statement and inquiry to the bailiff, here the foreperson asked the bailiff the question regarding 100 percent agreement, and the bailiff's comment was told to the foreperson and shared with at least Juror Overman. Lastly, while the record does not clearly reveal the amount of time that elapsed between the beginning of the jury deliberations and the point at which the foreperson asked the bailiff if they were to stay and deliberate until they reached a 100 percent agreement with the counts, the record reveals that the elapsed time was at least an hour and not the twenty minutes mentioned in Henri.

For the foregoing reasons, we reverse Sowers's convictions and remand for proceedings consistent with this opinion.

Reversed and remanded.

RILEY, J., concurs.

BRADFORD, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JASON LEE SOWERS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 08A02-1208-CR-640 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**BRADFORD, Judge, dissenting.**

Because I believe that the improper communication between the bailiff and the jury foreperson did not amount to fundamental error, I respectfully dissent. In addition, because I believe that Sowers cannot challenge the allegedly inconsistent verdicts on appeal and also that the evidence is sufficient to sustain the jury's determination that Sowers was guilty but mentally ill of Counts II and III, I would vote to affirm Sowers's convictions. However, I would vote to remand the matter to the trial court and instruct the trial court to amend the sentencing order to treat the habitual offender enhancement as a sentence enhancement on one of Sowers's underlying felony convictions rather than treating it as a separate consecutive sentence.

## I. Whether the Communication Between the Jury Foreperson and the Bailiff Amounted to Fundamental Error

19

While it was error for the bailiff to communicate with the jury about the law applicable to the case without notifying the trial court or relaying the jury's question to the trial court, it was not fundamental error. Sowers concedes that he did not object to or request a mistrial because of the conversation that took place between the jury foreperson and the bailiff when given an opportunity to do so before the trial court. As such, Sowers has waived this claim on appeal unless he can show that the erroneous conversation amounted to fundamental error. *See Oldham v. State*, 249 Ind. 301, 303, 231 N.E.2d 791, 792 (1967) (providing that failure to make a timely objection waives the right to question matters involving the conduct of the jury); *Leslie v. State*, 978 N.E.2d 486, 491 (Ind. Ct. App. 2012) (providing that issues of juror impropriety are waived where the defendant did not object at trial). Again, the Indiana Supreme Court has emphasized that the fundamental error rule is extremely narrow and, in order to qualify as fundamental error, "the error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Conner v. State*, 711 N.E.2d 1238, 1246 (Ind. 1999).

The record reveals that the jury foreperson approached the bailiff and asked if the jury "had to deliberate until they reached 100 percent agreement." Tr. p. 354. The jury foreperson did not reduce this question to writing, and the bailiff did not notify the trial court of the jury's question. Rather, the bailiff responded, "yes as the Judge stated in there you have to be 100 percent in agreement." Tr. pp. 355-56. Again, at the conclusion of the evidence, the trial court instructed the jury, both verbally and in writing, as follows:

To return a verdict, each of you must agree to it. Each of you must decide

20

> the case for yourself, but only after considering the evidence with the other jurors. It is your duty to consult with each other. You should *try* to agree on a verdict, *if* you can do so without compromising your individual judgment. Do not hesitate to re-examine your own views and change your mind if you believe you are wrong. But do not give up your honest belief just because the other jurors may disagree, or just to end the deliberations.

Appellant's App. p. 51 (emphases added). While not a complete restatement of the trial court's instruction to the jury, the bailiff's answer was not in any way inconsistent with this instruction or the law which requires that verdicts, if reached, be unanimous. Further, it is important to note that the bailiff did not expressly state that the jury was required to reach a verdict.

The communication between the bailiff and the jury foreperson did not make it impossible for Sowers to receive a fair trial. At most, the record suggests that Juror Overman *may* have relied on the jury foreperson's recitation of the bailiff's answer regarding whether the jurors had to agree "100%" to return a verdict. Juror Overman had expressed some hesitancy in finding Sowers guilty when polled by defense counsel and seemed disappointed to learn that the jury was not required to return a verdict. However, while the prosecutor stated that he interpreted Juror Overman's statements as suggesting that she *might* have proceeded differently if she had known that the trial court could declare a mistrial if the jurors could not all agree on a verdict, nothing in the record indicates that she definitely would have done so.

The prosecutor indicated that he interpreted the statement by Juror Overman to indicate that she apparently thought the jury must return a verdict. However, the prosecutor's interpretation of Juror Overman's mindset is totally speculative. The prosecutor's statements refer to a second-hand conversation, the specifics of which are

21

vague.  Moreover, neither party called the jury foreperson to testify about what she said to the jury, if anything, after speaking to the bailiff.  Likewise, neither party called Juror Overman to testify about whether she overheard the jury foreperson's conversation with the bailiff; what, if anything, the jury foreperson relayed to the members of jury about her conversation with the bailiff; or how Juror Overman's understanding and interpretation of this conversation impacted her decision to vote to find Sowers guilty.  For these reasons, the conversation between the jury foreperson and the bailiff did not constitute fundamental error.[6]

## II.  Inconsistent Verdicts/Sufficiency of the Evidence

Sowers also challenges the jury's determination that he was not guilty of Count I by reason of insanity but guilty but mentally ill of Counts II and III.  Sowers argues on appeal that these determinations are inconsistent and that the evidence is insufficient to support the determination that he was able to appreciate the wrongfulness of his behavior at the time he resisted arrest and fled from police.  However, to the extent that Sowers attempts to challenge his convictions on the ground that the verdicts were inconsistent, the Indiana Supreme Court has held that "[j]ury verdicts in criminal cases are not subject to appellate review on grounds that they are inconsistent, contradictory, or irreconcilable."  *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010).  As such, Sowers's claim should instead be framed as whether the evidence was sufficient to sustain the jury's determination that Sowers was able to appreciate the wrongfulness of his conduct.

With respect to claims of insanity, the Indiana Supreme Court has held as follows:

---

[6]  Moreover, I disagree with the majority's belief that *Coolman v. State*, 163 Ind. 503, 72 N.E. 568 (1904), is instructive because I believe that there are important and substantial differences between the comments attributed to the bailiff in the instant matter and those attributed to the bailiff in *Coolman*.

22

The defendant bears the burden of establishing the insanity defense by a preponderance of the evidence. I.C. § 35-41-4-1(b). To meet this burden, the defendant must establish both (1) that he or she suffers from a mental illness and (2) that the mental illness rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense. *See* I.C. § 35-41-3-6(a). Thus, mental illness alone is not sufficient to relieve criminal responsibility. *See Weeks v. State*, 697 N.E.2d 28, 29 (Ind. 1998). Rather, a defendant who is mentally ill but fails to establish that he or she was unable to appreciate the wrongfulness of his or her conduct may be found guilty but mentally ill ("GBMI"). *See, e.g.*, *Taylor v. State*, 440 N.E.2d 1109, 1112 (Ind. 1982).

Whether a defendant appreciated the wrongfulness of his or her conduct at the time of the offense is a question for the trier of fact. *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004). Indiana Code section 35-36-2-2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity. Such expert testimony, however, is merely advisory, and even unanimous expert testimony is not conclusive on the issue of sanity. *Cate v. State*, 644 N.E.2d 546, 547 (Ind. 1994). The trier of fact is free to disregard the unanimous testimony of experts and rely on conflicting testimony by lay witnesses. *Barany v. State*, 658 N.E.2d 60, 63 (Ind. 1995). And even if there is no conflicting lay testimony, the trier of fact is free to disregard or discredit the expert testimony. *Thompson*, 804 N.E.2d at 1149.

Because it is the trier of fact's province to weigh the evidence and assess witness credibility, a finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts. *See Barany*, 658 N.E.2d at 63. A defendant claiming the insanity defense should have prevailed at trial faces a heavy burden because he or she "is in the position of one appealing from a negative judgment." *Thompson*, 804 N.E.2d at 1149. A court on review will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact (even though "more reasonable" inferences could have been made). *Id.* at 1149-50.

*Galloway v. State*, 938 N.E.2d 699, 708-09 (Ind. 2010).

Here, while Doctors Little and Rogers were both of the opinion that Sowers was unable to appreciate the wrongfulness of his actions, Detective Ronald Blackwell opined otherwise. The record reveals that Detective Blackwell testified that he believed that Sowers knew he was being followed by police because Sowers initially operated his

23

vehicle in an appropriate manner while Officer Dillingham, who was in uniform and was following Sowers in a marked police vehicle with his police lights and siren activated, followed immediately behind Sowers's vehicle. Officer Dillingham was subsequently joined by other marked police vehicles in his pursuit of Sowers. The weather was dry and sunny and there was nothing in the record indicating elements that would inhibit or impair Sowers's vision of the officers or make it difficult for him to hear the sirens. In addition, when police finally caught up with Sowers, Detective Blackwell did not remember Sowers being overly agitated or anything strikingly unusual about Sowers's appearance. Detective Blackwell testified that Sowers denied knowing that police were behind him, but that he "[did] not believe that." Tr. p. 156.

Again, it was for the jury to weigh the evidence and assess witness credibility. *Galloway*, 938 N.E.2d at 709. The jury reviewed the reports submitted by Drs. Little and Rogers indicating that each believed that Sowers was unable to appreciate the wrongfulness of his conduct, but apparently did not agree with the Drs. Little's and Roger's opinions. The doctors' opinions were "merely advisory" and were not conclusive on the issue of sanity, and it was within the province of the jury to credit Detective Blackwell's testimony over the doctors' opinions regarding Sowers's sanity. *See id*. Because the reasonable inferences made by the jury with respect to witness credibility and the weight of witness testimony should not be disturbed on appeal, Sowers's convictions should be affirmed on this ground.

In sum, I would conclude that conversation between the jury foreperson and the bailiff did not rise to the level of fundamental error. I would also conclude that the

24

evidence is sufficient to support the jury's determination regarding Sowers's mental state. Accordingly, I respectfully dissent and would vote to affirm Sowers's convictions. However, as is stated above, I would vote to remand the matter to the trial court and instruct the trial court to amend the sentencing order to treat the habitual offender enhancement as a sentence enhancement on one of Sowers's underlying felony convictions rather than treating it as a separate consecutive sentence. *See Harris v. State*, 964 N.E.2d 920, 927 (Ind. Ct. App. 2012) (providing that a finding that one is a habitual offender is a sentence enhancement imposed upon the conviction of a subsequent felony and should not be treated as a separate sentence), *trans. denied*.