FILED
Jun 28 2016, 8:51 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Patricia Caress McMath
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Timothy J. Jimerson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | June 28, 2016 <br><br> Court of Appeals Case No. <br> 52A02-1510-CR-1538 <br><br> Appeal from the Miami Circuit Court <br><br> The Honorable Timothy P. Spahr, Judge <br><br> Trial Court Cause No. <br> 52C01-1210-MR-2 |

**Bailey, Judge.**

# Case Summary

Timothy Jimerson ("Jimerson") appeals his conviction for Voluntary Manslaughter, a Class A felony.[1] He presents the sole issue of whether the trial court abused its discretion in restricting the testimony of an expert witness. We affirm.

# Facts and Procedural History

During the early morning hours of August 29, 1992, Toni Spicer ("Spicer") was beaten with a blunt object and strangled to death in her home. A few hours later, Spicer's young child found her deceased, naked, and tied to her bed with pantyhose. Initially, several suspects were investigated but no arrests were made and the case grew cold.

In 2001, the "cold case" was assigned to Indiana State Police Detective Mike Tarrh ("Detective Tarrh"), and he submitted additional items for forensic testing. (Tr. at 761.) In 2008, a DNA profile was created from a hair that had been found upon Spicer's body. In 2011, Detective Tarrh was notified that there was a DNA "hit." (Tr. at 763.) Detective Tarrh was informed that the DNA profile was consistent with that of Jimerson, who had submitted a DNA

---

[1] Ind. Code § 35-42-1-3.

sample during criminal proceedings in Mississippi. Detective Tarrh also learned that, in 1992, Jimerson had lived in the same trailer court as Spicer.

[4] On October 2, 2012, Detective Tarrh and Sergeant Rob Ricks ("Sergeant Ricks") traveled to Biloxi, Mississippi and conducted a video-taped interview of Jimerson. Jimerson initially denied his culpability, but ultimately confessed that he had killed Spicer because she laughed at him during a sexual encounter.

[5] Jimerson was charged with Murder, tried before a jury, and convicted of Voluntary Manslaughter, as a lesser-included offense of Murder. He was sentenced to forty-five years imprisonment. He now appeals.

# Discussion and Decision

[6] Prior to trial, Jimerson filed a motion to suppress his police statement, arguing that it was a product of psychological coercion. The suppression motion was denied, and Jimerson notified the State that he intended to present an expert witness on false confessions. The State filed a motion in limine seeking to restrict expert testimony:

> Said witness should be admonished to not testify as to the Defendant's intent, guilt or innocence, the truth or falsity of allegations, or give an opinion on the truthfulness of the Defendant's statements given in this case, or to give any legal conclusions. His testimony should be limited to his expertise regarding false confessions.

(App. at 109.) The motion was granted.

[7]     At trial, Jimerson presented the testimony of Dr. Richard Leo ("Dr. Leo"), a law professor and expert in the field of false confessions. Dr. Leo opined that the "Reid method" of interrogation is widely used but "might be too effective" in some cases. (Tr. at 1048.) Dr. Leo explained that interviewing and interrogation are different concepts. According to Dr. Leo, the goal of interviewing is information gathering, and the goal of interrogation is to produce incriminating evidence from a person a police officer believes to be guilty of a crime. The overall strategies used in interrogation derived from the Reid method are two-fold: convince the subject that his or her continued resistance is futile and identify a benefit that the subject will gain from confessing.

[8]     Dr. Leo described hallmarks of the method and provided some examples. An interrogation would typically take place in an isolated setting, where the officer might better be able to develop rapport with the subject. The officer might confront the subject with real or false evidence, or a combination, to convince the subject that there is so much evidence against him or her, he or she is essentially "trapped." (Tr. at 1052.) Dr. Leo described this as an "evidence ploy." (Tr. at 1060.) The officer might also "spin a scenario," such as an accident scenario, which might "imply mercy" would be forthcoming. (Tr. at 1062-64.) A subject might be made to feel that there was a window of time in which to provide an explanation and keep others from thinking the worst of his or her conduct. Ultimately, a subject was to be persuaded that a confession would be in his or her best interests.

After Dr. Leo provided this background, defense counsel confirmed that Dr. Leo had watched the videotape of Jimerson's statement. Defense counsel then ventured: "And there was a point where," prompting an objection from the prosecutor. (Tr. at 1064.) The jury was excused and the parties presented argument as to the breadth of false confession testimony in light of three cases under consideration by the trial court: *Callis v. State*, 684 N.E.2d 233, 239 (Ind. Ct. App. 1997); *Miller v. State*, 770 N.E.2d 763, 772 (Ind. 2002); and *Shelby v. State*, 986 N.E.2d 345 (Ind. Ct. App. 2013). The trial court ruled that Dr. Leo could testify "about the phenomena of false confessions" and about "problematic practices" but the jury was to determine whether a particular technique had been applied in Jimerson's case. (Tr. at 1072, 1076.) The trial court expressed concern that allowing testimony such as "I saw Detective Tarrh do this" would invade the province of the jury. (Tr. at 1076.)

In an offer of proof, Dr. Leo testified that he had noticed "risk factors" for false confessions present in Jimerson's statement. (Tr. at 1139.) He agreed that it was "important for the jury to understand" that Jimerson had been told his DNA was all over Spicer's body. (Tr. at 1140.) Dr. Leo also acknowledged that Jimerson had been assured that he was not "a monster" and had been given the opportunity to explain that "something bad" happened, and a scenario was suggested that it perhaps related to drugs and sex. (Tr. at 1140-41.) Additionally, Dr. Leo opined that Jimerson's interrogation provided an example of "time pressure" and that being presented with a gruesome crime scene photo (as was done in this case) can "have a very powerful effect on some

people." (Tr. at 1143.) The trial court reiterated that the jury could apply the concepts introduced by Dr. Leo without the specific categorization and that the earlier ruling would stand.

[11] On appeal, Jimerson contends that the trial court too narrowly construed *Callis*, *Miller*, and *Shelby* and abused its discretion by excluding Dr. Leo's testimony addressing the particular circumstances surrounding Jimerson's confession. The decision to admit or exclude evidence is a matter within the sound discretion of the trial court. *Hape v. State*, 903 N.E.2d 977, 991 (Ind. Ct. App. 2009), *trans. denied*. We afford an evidentiary decision great deference upon appeal and reverse only when a manifest abuse of discretion denies the defendant a fair trial. *Collins v. State*, 826 N.E.2d 671, 677 (Ind. Ct. App. 2005), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or the trial court has misapplied the law. *Walker v. Kelley*, 819 N.E.2d 832, 836 (Ind. Ct. App. 2004).

[12] The case law appears to present three categories of expert testimony regarding false or coerced confessions: a general description of techniques and goals; highlighting of practices used in a particular interview; and the impact of techniques on a particular confession. The parties agree that general testimony is permissible and that allowing testimony on the latter category would invade the province of the jury. They disagree, in light of the relevant precedent, as to admissibility of evidence falling within the second category.

In *Callis*, Dr. Richard Ofshe ("Dr. Ofshe") was allowed to testify about the phenomena of false or coerced confessions but was not permitted to comment that there were three different versions of an inculpatory statement or to offer opinion testimony such as "someone is telling the truth and someone is lying." *Callis*, 684 N.E.2d at 239. On appeal, a panel of this Court concluded: "the trial court properly admitted Ofshe's testimony regarding the phenomenon of coerced confessions and properly excluded his opinion about Callis's interrogation." *Id.* Citing Indiana Evidence Rule 704(b),[2] the Court further observed that no witness is competent to testify that another witness is or is not telling the truth. *Id.* at 239-40.

In *Miller*, Dr. Ofshe was called as a defense expert witness but was not permitted to testify before the jury. On appeal, the defendant argued that he was "entitled to present expert testimony regarding the psychology of false confessions that would enable the jury to understand why the mentally retarded defendant 'would succumb to the lies' even though he was innocent." 770 N.E.2d at 772. Our Indiana Supreme Court held that the erroneous exclusion of the whole of Dr. Ofshe's testimony affected the substantial rights of the defendant and granted a new trial. *Id.* at 774.

After discussing the holding in *Callis*, the Court wrote:

---

[2] Rule 704(b) provides: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

We understand *Callis* to prohibit expert opinion testimony regarding the truth or falsity of one or more witnesses' testimony, but it does not generally prohibit expert testimony regarding police techniques used in a particular interrogation. . . . From our review of the circumstances in the present case, the general substance of Dr. Ofshe's testimony would have assisted the jury regarding the psychology of relevant aspects of police interrogation and the interrogation of mentally retarded persons, topics outside common knowledge and experience. In the event that some of Dr. Ofshe's testimony to the jury would have invaded Rule 704(b)'s prohibition of opinion testimony as to the truth or falsity of the defendant's statements, the trial court could have sustained individualized objections at trial. We hold that excluding the proffered expert testimony in its entirety deprived the defendant of the opportunity to present a defense.

*Id*.

[16]    In *Shelby*, a panel of this Court again addressed the proper parameters of testimony from an expert on false or coerced confessions. Dr. Leo had been permitted to testify at some length regarding false confessions and the methods police use during interrogation. 986 N.E.2d at 368. He also testified about what he considered problems with the Reid method used by police who interrogated Shelby; however, the trial court sustained the State's objection when Shelby's counsel asked Dr. Leo if he thought that the tactics used by the police when interrogating Shelby were coercive. *Id.*

[17]    Shelby made an offer of proof, demonstrating that Dr. Leo would have testified that several of the techniques used by the police while interrogating Shelby were consistent with the sort of factors that increase the risk of eliciting a false

confession, including:  suggesting that the crime was either self-defense or a horrible murder, thus suggesting that if Shelby admitted to killing Lexi, he might not be subject to criminal liability; the lengthy and repetitive nature of the interrogations; and lying about the amount of evidence implicating Shelby.  *Id.*

[18]    The *Shelby* Court reviewed the *Callis* and *Miller* decisions, then wrote:

> We understand the *Miller* court's general approval of *Callis* to mean that experts may testify on the general subjects of coercive police interrogation and false or coerced confessions.  *Miller*, 770 N.E.2d at 773.  Experts may also testify regarding the techniques the police used in a particular interrogation.  *Id.*  Experts may not, however, comment about the specific interrogation in controversy in a way that may be interpreted by the jury as the expert's opinion that the confession in that particular case was coerced or false, as this would invade the province of the jury and violate Evidence Rule 704(b).
>
> Applying this reading to the facts of the present case, it is not readily clear whether the trial court erred in excluding portions of Dr. Leo's testimony.  The trial court permitted Dr. Leo to testify at length regarding the tactics that increase the risk of a coerced confession or a false confession.  Thus, the facts of the present case align more with what occurred in *Callis* than what occurred in *Miller*.  The trial court here, unlike the trial court in *Miller*, did not wholly exclude the expert witness's testimony regarding the phenomenon of false confessions and the tactics that can lead thereto.  Instead, like the trial court in *Callis*, the trial court here excluded only those portions of the expert's testimony that dealt with the specifics of the police interrogation of the defendant.  But *Miller* specifically held that an expert could testify "regarding police techniques used in a particular interrogation."  *Miller*, 770 N.E.2d at 773.

However, even if the court erred in limiting Dr. Leo's testimony, the error would not require reversal. Dr. Leo was required to testify at length about police interrogation tactics that can increase the risk of a false or coerced confession. The jury was also presented with extensive evidence regarding the police interrogations of Shelby in written, video, and audio formats, and could observe whether his interrogation included the tactics and techniques that Dr. Leo testified could lead to a false or coerced confession. Thus, the jury was able to apply the concepts about which Dr. Leo testified to the facts and circumstances of Shelby's interrogation and subsequent confession. This is all that Dr. Leo could have testified to under our reading of *Miller* and *Callis*. Shelby's counsel also cross-examined Detective Gardner at length regarding the Reid technique and the tactics he used while interrogating Shelby. He also explored the inconsistencies between Shelby's confession and the physical evidence presented by the State at trial. Under these facts and circumstances, we conclude that the trial court's limitations of Dr. Leo's testimony did not amount to reversible error.

986 N.E.2d at 369-70.

[19] Jimerson argues that *Shelby* can be read to "suggest" that *Miller* provides for admissibility of expert testimony on "techniques used in the particular interrogation." Appellant's Br. at 16. The State responds that *Miller* may not be construed so broadly as to permit expert testimony to invade the province of the jury. The State asserts that, while an expert witness may testify regarding techniques he deems problematic, he may not go on to comment on the operation of a problematic technique in the case at bar. According to the State, this would amount to a form of "reverse vouching." State's Brief at 14. In the

State's view, if a witness may not vouch for the truthfulness of a witness statement, a witness may not vouch for the falsity of a confession.

[20] At the outset, we acknowledge that the *Miller* decision included the observation that *"Callis … does not generally prohibit expert testimony regarding police techniques used in a particular interrogation."* 770 N.E.2d at 773. This is not to say that such testimony is always admissible or that an expert may review a confession frame by frame for the jury. "Expert testimony is appropriate when it addresses issues not within the common knowledge and experience of ordinary persons and would aid the jury." *Id.* (citing Evid. R. 702(a)). The expert witness is to function as a '"specialist to supplement the jurors' insight."' *Id.* (quoting *Carter v. State*, 754 N.E.2d 877, 882 (Ind. 2001)). We understand this to mean that an expert should not be invited to cross the line at which the jury can proceed without further aid.

[21] Here, Dr. Leo testified at length about certain tactics he considered "too effective" at times. (Tr. at 1048.) In the offer of proof, Jimerson's counsel sought to describe particular exchanges during Jimerson's interrogation and elicit Dr. Leo's opinion as to whether such "fit the category." (Tr. at 1146.) The trial court concluded that it was within the province of the jury – as opposed to Dr. Leo – to apply the concepts he had discussed. The trial court then excluded Jimerson's proffered categorization and application evidence. We are not persuaded that this exclusion was an abuse of discretion.

[22] The instant circumstances do not mirror those of *Miller*. That case involved a complete exclusion of expert testimony and a defendant of particular vulnerability, where the appellate court noted that the interrogation of a mentally retarded person is outside the common knowledge and experience of the jury. *Miller*, 770 N.E.2d at 774. Here, there was no need for an expert to point out the techniques allegedly employed to secure Jimerson's confession.

[23] Together with extensive background testimony from Dr. Leo, the jury was provided with Jimerson's statement in audio, video, and written form. Moreover, Jimerson testified and explained his subjective view, that is, he had said certain things he later recanted because he was "very scared." (Tr. at 1163.) He testified that he had been led into scenarios, told that his DNA was all over Spicer's body and house, and encouraged to demonstrate that he was not a monster. As such, the jury had been given adequate information to apply its common knowledge and experience. Where a jury is able to apply concepts without further assistance, highlighting individual exchanges or vouching for the truth or falsity of particular evidence is invasive.

# Conclusion

[24] Jimerson has not demonstrated that the trial court abused its discretion in the restriction of expert testimony.

Affirmed.

Bradford, J., and Altice, J., concur.