## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 21 2017, 5:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James F. Morris,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 21, 2017<br><br>Court of Appeals Case No.<br>42A01-1604-CR-920<br><br>Appeal from the<br>Knox Superior Court<br><br>The Honorable<br>Gara U. Lee, Judge<br><br>Trial Court Cause No.<br>42D01-1602-F3-2 |

**Kirsch, Judge.**

[1]     Following a jury trial, James F. Morris ("Morris") was convicted of Level 3 felony aggravated battery[1].  He appeals and raises the following two restated issues:

> I.  Whether the trial court committed reversible error when it admitted witness testimony and videotaped evidence that included the victim's out-of-court statements; and

> II.  Whether the State presented sufficient evidence to prove that Morris inflicted injuries on the victim that created a substantial risk of death.

[2]     We affirm.

## Facts and Procedural History

[3]     On January 22, 2016, Alissa Yarber ("Yarber") was dating and living with Morris.  Morris's brother, Donald Morris ("Donald") also lived at the residence.  That morning, Yarber and Morris, while in their bedroom, injected themselves with bath salts.  Yarber sensed that her reaction to the drug "was different" than usual, and she "couldn't breathe[.]"  *Tr.* at 417.  Morris told Yarber to perform oral sex on him, and when she told Morris that she could not, Morris became angry.  He grabbed her by the back of the head and punched her in the back of the head.  He took off Yarber's pants and got on top of her, despite Yarber's protests.  At some point, he kicked her in the crotch and

---

[1] *See* Ind. Code § 35-42-2-1.5.

said he was "tired of wasting his drugs on [her]." *Id*. at 419. At some point, he shoved her toward the bathroom, telling her to get dressed and leave. She took her purse and clothes and went to the bathroom, which adjoined the bedroom, and got dressed. Yarber had Morris's cell phone in her purse, and because she was scared and wanted to leave, she called her ex-husband, Jason Yarber[2] ("Jason"). When she removed the cell phone from her purse, she also removed a small can of mace to use on Morris "if [she] needed it[.]" *Id*. at 421. Meanwhile, Morris was in the other room, yelling and cussing and throwing things around.

[4] Yarber called Jason, but before she had a chance to say anything, Morris opened the door to the bathroom. He grabbed Yarber's hair and tried to pull her by the hair out of the bathroom; although her head was down, Yarber sprayed the mace. She was screaming at Morris to stop and telling him that she would leave the house, and, although she was not sure the phone call had gone through, she was screaming to Jason, "come help me, he's gonna kill me[.]" *Id*. at 423. The two were still in the bathroom, and when she sprayed the mace, Morris grabbed and choked Yarber. She hit her head on the bathtub, and when she was on the floor, Morris kicked Yarber and stomped on her chest and stomach. He also put one knee on Yarber to hold her down and "cracked" her neck. *Id*. at 424. She urinated in her pants "and couldn't move[.]" *Id*.

---

[2] Jason and Yarber are the biological parents of three children, and Jason testified that, therefore, he and Yarber were in contact with each other most days.

[5]　Morris summoned Donald to come and stand in the doorway to keep an eye on Yarber, while Morris left the room, went to the kitchen, and came back with a wet cloth on his eyes. At some point, Donald heard a knock at the front door, and believed that the police had been called and were at the door. Morris shoved Yarber back in the bathroom, and locked her inside it but putting a chair under the door knob so that she could not open it and leave.

[6]　At the door was Jason. Yarber, still screaming in the bathroom, broke a small window hoping to be able to crawl through it. Morris opened the bathroom door and told Yarber to get out; she ran to the dining room, where she saw Jason standing at the front door talking to Donald and asking for Yarber. Jason told Morris and Donald that he was "getting her out of here." *Id.* at 505. He could see that she appeared to have been in a fight and that her pants were wet. Jason's nephew had accompanied Jason to Morris's house, and the nephew got in Yarber's car and drove her to the hospital.

[7]　At the hospital, Yarber told medical personnel that she had injected what she believed to be bath salts. She said that she "hurt all over" and could not get her breath. *Id.* at 432. She was taken for a chest x-ray and, ultimately, was admitted to the intensive care unit for three days. Yarber suffered a broken rib, which had punctured her lung. As a result, she had surgery to implant a chest tube to alleviate pressure and re-inflate her lung. She also had bruises and scrapes to her body.

[8] While at the hospital, before receiving treatment, Yarber spoke with Vincennes Police Department Officer Jordan Christie ("Officer Christie"), who was dispatched after the Vincennes Police Department received a call from the hospital. Officer Christie observed physical injuries and believed that Yarber was under the influence of drugs. Yarber told him that Morris was the person who had battered her. Officer Christie determined that he was unable to take a full statement from Yarber, and he left. The next evening, Officer Donald Halter ("Officer Halter") went to the hospital after receiving a call from Yarber's father. Yarber told Officer Halter that she desired to press charges against Morris. On January 29, 2016, Yarber gave a videotaped statement to Detective Joshua Burke ("Detective Burke") at the police station, and Yarber described what Morris had done to her. Detective Burke also met with Jason, who provided a videotaped statement to police. Later that same day, police brought Morris into headquarters and took a statement from him.

[9] On February 5, 2016, the State charged Morris with Level 3 felony aggravated battery. At the four-day jury trial in April 2016, the State called as witnesses, in this order, the following individuals: Officer Christie, Officer Halter, Detective Burke, Carl Holt. M.D. ("Dr. Holt"), Yarber, and Jason. After his motion for judgment on the evidence was denied, Morris testified, along with his brother Donald.

[10] At trial, Officer Christie stated that he was dispatched to the hospital shortly before 5:00 a.m. on January 22 in reference to a battery, and he met Yarber in the emergency room. Officer Christie observed visible signs of battery, and he

believed that Yarber appeared to be "extremely high" and under the influence of drugs at that time. *Tr.* at 255. Yarber was not able to tell him where she was when the battering occurred or how it happened, although she told him that Morris was the person who had battered her. Officer Christie took pictures of her injuries, including abrasions and contusions to her forehead, elbow, and neck, and asked Yarber if she desired to press charges; she told him that she was not sure, and he advised Yarber, if she decided to pursue charges, to come to the police department "when you get sober." *Id.* at 244.

[11] Next, Officer Halter testified, stating that on the evening of January 23, he received a phone call from Yarber's father, who Officer Halter personally knew, asking for Officer Halter to come and speak to his daughter at the hospital. Officer Halter visited Yarber in her hospital room, and he testified that Yarber told him that Morris had battered her, that she desired to pursue criminal charges against Morris, and that he left the appropriate complaint sheet with her to fill out later. On cross-examination, Morris's counsel asked Officer Halter a series of questions regarding the substance of Officer Halter's notes from the police report that Officer Halter had prepared after speaking with Yarber. The questions asked, and Officer Halter acknowledged, that Yarber had told him that Morris threw her on the bed, was upset that she could not perform oral sex on him, kicked and stomped on her, after which she ran to the bathroom, Morris threw her purse at her, and then she sprayed him with mace. *Id.* at 271. Morris's counsel offered the police report as a defense exhibit, and it was admitted into evidence. *Defendant's Ex.* B.

[12]  Detective Burke testified next, stating that he contacted Yarber, and she came to police headquarters on January 29 and gave a videotaped interview. He testified to what Yarber had told him about the incident, including that she and Morris injected bath salts and intended to have sex afterward, but that she immediately noticed that she was having a bad reaction and could not breathe or move. He testified that Yarber told him that Morris became angry and hit her in the head, and she moved to the bathroom and dialed Jason on a cell phone, but before she spoke to him, Morris came in the bathroom and came at her, at which time she sprayed mace at him. Yarber told Detective Burke that Morris became angrier and knocked her down, and she hit her head on the bathtub. Morris positioned himself on top of her, kneed her, kicked her, and stomped on her. Detective Burke said that Yarber told him that she thought that "she may have blacked out in there for a few minutes." *Tr.* at 295. She further told Detective Burke that Morris and Donald heard a knock on the door, so they left her in the bathroom, Morris placed a chair under the door knob to prevent her from leaving, and she broke a window in an attempt to get out or get the attention of whoever was at the front door. During Detective Burke's testimony, the jury viewed a video recording of Yarber's statement, and the recording was admitted into evidence without objection. *Id.* at 297, 315; *State's Ex.* 4. Detective Burke's supplemental report, which summarized Yarber's version of the incident as described in her interview, was admitted into evidence without objection. *Tr.* at 374; *State's Ex.* 13.

[13] Detective Burke also testified to meeting with Jason and taking a videotaped statement from him. Over Morris's hearsay objection, Detective Burke testified that Jason told him about receiving a phone call from Yarber, hearing Yarber and Morris fighting, and going to Morris's house to get Yarber. During Detective Burke's testimony, Jason's videotaped statement was also played for the jury and admitted into evidence. *Tr.* at 327; *State's Ex.* 7. In the interview, Jason told Detective Burke that he received the phone call from Yarber, that he heard two people fighting, and that he heard Yarber repeatedly say, "Help me, Jason." *State's Ex.* 7. He told Detective Burke that he hung up the phone, drove to Morris's house, and beat on the front door, which Donald eventually opened. Jason said that Donald acknowledged that Yarber was inside the house and that Morris and Yarber had been fighting.

[14] The State next called as a witness Dr. Holt, the emergency physician who treated Yarber when she arrived at the hospital. Yarber's chief complaint was pain in her ribs, and he observed that she had several contusions. She was diagnosed as having "a rib fracture with a partial collapsed lung." *Tr.* at 348. As a result of the collapsed lung, the surgeon on call was contacted because "most times they don't come back up on their own[,]" and it was determined that a chest tube needed to be placed in order to "re-expand the lung." *Id.* at 348-49. When asked if a collapsed lung, "whether it's treated or not," could create a substantial risk of loss of life, he responded in the affirmative. *Id.* at 352, 357. Dr. Holt noted that her rib was displaced, indicating greater force or trauma than would be necessary to merely fracture it. Dr. Holt on cross-

examination stated that Yarber was not at risk of dying while being treated at the emergency room, her lung was re-expanded within a number of hours of having the chest tube inserted, and at that point, she had no further risk of injury. *Id*. at 365-66.

[15] When Jason testified, he described how he received a telephone call at approximately 3:00 a.m., and when he answered, he heard a male and a female voice arguing, and then he recognized Yarber's and Morris's voices. Jason heard Yarber scream, "Jason, help me." *Id*. at 494. He heard Morris threaten to "snap [her] neck," and he heard Yarber yell, "[G]et off of me." *Id*. at 495. Jason hung up the phone and drove to Morris's house, as he knew Yarber was staying there. The front door was locked, but after beating on it, Donald eventually answered it and let Jason in the house. Jason described that Yarber looked "terrified" and could not breath well. *Id*. at 503. After leaving Morris's home, Jason decided Yarber needed to go to the hospital because her chest hurt, and she was having trouble breathing. Jason testified that upon arriving at the hospital, Yarber told the staff that she had been in a fight with her boyfriend. Jason also stated that Yarber told him that Morris tried to grab and twist her neck and that Morris stomped on her while she was on the ground.

[16] The jury found Morris guilty as charged, and the trial court sentenced Morris to sixteen years in the Indiana Department of Correction, with four years suspended to probation. Morris now appeals.

# Discussion and Decision

## I. Admission of Evidence

Morris argues that, before Yarber testified, "the jury heard the State's case" through "the hearsay testimony" of the three police officers, as well as Yarber's and Jason's videotaped statements to police and that, after Yarber testified, the jury heard "more hearsay" from Jason, whose testimony included what Yarber had told him and what she told medical personnel at the hospital. *Appellant's Br.* at 9. Morris contends that the trial court erred when it admitted the testimony and videotaped interviews because that evidence resulted in a drumbeat of repetition that impermissibly bolstered Yarber's credibility, prejudiced the jury, and denied him a fair trial.

The decision to admit or exclude evidence is a matter within the sound discretion of the trial court. *Jimerson v. State*, 56 N.E.3d 117, 120 (Ind. Ct. App. 2016), *trans. denied*; *Norris v. State*, 53 N.E.3d 512, 525 (Ind. Ct. App. 2016). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances of the case or misinterprets the law. *Jimerson*, 56 N.E.3d at 570. The number of witnesses who may be called to prove a single issue of fact is within the trial court's sound discretion. *Norris*, 53 N.E.3d at 525. We afford an evidentiary decision great deference upon appeal and reverse only when a manifest abuse of discretion denies the defendant a fair trial. *Id.* Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party. Ind. Trial Rule 61; Ind. Evidence Rule 103(a); *Norris*, 53 N.E.3d at 524-

25.  In determining whether an evidentiary ruling affected a party's substantial rights, we assess the probable impact of the evidence on the trier of fact.  *Kirk v. State*, 974 N.E.2d 1059, 1066 (Ind. Ct. App. 2012), *trans. denied*.  The erroneous admission of evidence may be harmless if it is merely cumulative of other evidence in the record.  *Pavey v. State,* 764 N.E.2d 692, 703 (Ind. Ct. App. 2002), *trans. denied*.

[19]  Morris acknowledges that his only objection to the now-challenged evidence was during Detective Burke's testimony, at the point when the State was asking Detective Burke what Jason had told him.  Morris objected on the basis of hearsay, not on the basis of drumbeat repetition.  *Tr.* at 320; *see* Ind. Evid. Rule 801(c) (hearsay is a statement "that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted.").  The State argued that it was not offering the testimony for the truth of the matter asserted, but rather, was offering it to show what the officer did as a result of being told the information.  The trial court overruled Morris's objection, and Detective Burke testified that Jason had told him about receiving the phone call, recognizing the number, and knowing that Yarber was with Morris, and that he could recognize their voices and could tell Yarber "was in trouble" and was in a physical fight.  *Tr.* at 321.  Jason told Detective Burke that he went to Morris's home and saw that Yarber "clearly" had been in a fight and appeared to be "in pain."  *Id.*  Given Yarber's own detailed and consistent testimony of Morris's beating, we find that the probable impact of Detective Burke's testimony, relating Jason's generalized statement of

what he heard on the phone and observed upon arriving at Morris's house, was negligible and did not affect Morris's substantial rights or deny him a fair trial. Furthermore, Jason later testified without objection that Yarber had told him that Morris had tried to twist her neck and stomped on her and she was having chest pain and trouble breathing. Thus, any error in the admission of Detective Burke's testimony, concerning what Jason said to him during the interview, was harmless.

[20] The remainder of the now-challenged evidence was admitted into evidence without any objection. As a general rule, failure to object at trial results in waiver of an issue for purposes of appeal. *Norris*, 53 N.E.3d at 525. Thus, as to the evidence to which Morris failed to object at trial, his argument is waived, unless the admission of the testimony and videotapes constituted fundamental error. *Id*. (defendant waived his claim that testimony of multiple witnesses constituted drumbeat repetition that denied him fair trial, where he failed to object on basis of drumbeat repetition); *Surber v. State*, 884 N.E.2d at 856, 863 (Ind. Ct. App. 2008), *trans. denied*. "The fundamental error doctrine is very narrow, and it arises only when there are 'clearly blatant violations of basic and elementary principles, and the harm or potential for harm could not be denied.'" *Norris*, 53 N.E.3d at 525 (quoting *Warriner v. State,* 435 N.E.2d 562, 563 (Ind. 1982)). Fundamental error occurs only when the error is so prejudicial to the rights of the defendant that a fair trial is rendered impossible. *Id*. "This exception is available only in 'egregious circumstances.'" *Brown v.*

*State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)).

[21] Morris contends that fundamental error occurred at his trial because "[t]he . . . hearsay accounts of Yarber's out-of-court statements regarding the offense that came in through Officer Christie, Officer Halter, Detective Burke, and Jason, created a prejudicial drumbeat of the allegations against Morris," and that all, except for Jason's testimony, was "heard or seen by the jury before the declarant testified." *Appellant's Br*. at 13. To support his argument of drumbeat repetition, Morris relies, in part, on *Modesitt v. State,* 578 N.E.2d 649, 650 (Ind. 1991) and *Stone v. State,* 536 N.E.2d 534, 541 (Ind. Ct. App. 1989), *trans. denied*.

[22] In *Stone,* the State had four adult witnesses testify to out-of-court statements made by the child victim, and at least one of the adults testified before the child took the stand. 536 N.E.2d at 537. This court found that the child's credibility "became increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion, and professionalism to [the child's] out-of-court statements," so that the "presumption of innocence was overcome long before [Stone] got to the stand." *Id.* at 540. We reversed Stone's conviction for child molesting because the State used multiple witnesses to produce a "drum beat repetition" of the child victim's story. *Id*. at 541. Later, in *Modesitt*, our Supreme Court reversed a child molesting conviction where the victim's mother, a caseworker, and a psychologist all testified over objection and prior to the victim taking the stand, as to the victim's statements to them about the details of the molestation. 578 N.E.2d at 650. The *Modesitt* Court determined

that permitting the three witnesses to repeat the accusations of the victim prior to the victim testifying effectively precluded the defendant from cross-examining the victim regarding the truthfulness of the statements, and resulted in the victim's veracity being vouchsafed prior to taking the witness stand. *Id.* at 651.

[23] Morris argues that the testimony of the officers, combined with the videotaped statements and Jason's later testimony resulted in the drumbeat repetition of Yarber's allegations and rendered a fair trial impossible. We disagree.

[24] *Modesitt* and *Stone* are distinguishable and are not determinative of the present case. In both of those cases, the challenged evidence was admitted over objection, unlike in the present case. Also, both *Stone* and *Modesitt* involved child victims, who might not be susceptible to vigorous cross examination as an adult would be. Indeed, here, Yarber testified and was subject to meaningful cross examination, including as to her impairment and discrepancies in her sequence of events. Moreover, Yarber's testimony was not in the same danger of being bolstered by "adult . . . eloquence, maturity, . . . and professionalism[,]" as a child's testimony might be. *Stone*, 536 N.E.2d at 540. We also note that the testimony of the officers was consistent with, although not more elaborate than, Yarber's detailed testimony, and, as the State observes, Morris invited error with regard to Officer Halter's testimony, as Morris's counsel elicited specific detail from Officer Halter concerning what Yarber had told him about the incident. Under the doctrine of invited error, a party may not take advantage of an error that she commits, invites, or which is

the natural consequence of her own neglect or misconduct. *Hill v. State*, 51 N.E.3d 446, 451 (Ind. Ct. App. 2016).

[25] We conclude that Morris has failed to establish that any error was fundamental. *See Eastwood v. State,* 984 N.E.2d 637, 641 (Ind. Ct. App. 2012) (evidence challenged on appeal as "drumbeat repetition" of victim's testimony was not objected to at trial and defendant failed to establish fundamental error), *trans. denied*; *Surber*, 884 N.E.2d at 864 (improper admission of hearsay testimony of two witnesses that "confirmed but did not elaborate upon" the victim's testimony would have had only minor impact on the jury because there was little to undermine the victim's credibility); *Willis v. State,* 776 N.E.2d 965, 968 (Ind. Ct. App. 2002) (testimony and videotaped interview did not amount to the drumbeat of repetition condemned in *Modesitt*); *McGrew v. State,* 673 N.E.2d 787, 796 (Ind. Ct. App. 1996) (improper admission of hearsay testimony from two witnesses whose testimony was "brief and consistent with" the victim's testimony did not "constitute drumbeat repetition of the victim's statements"), *summarily affirmed* by 682 N.E.2d 1289, 1292 (Ind. 1997)).

## II. Sufficiency of the Evidence

[26] Morris asserts that the State failed to present sufficient evidence to convict him. In reviewing challenges to the sufficiency of the evidence, this court does not reweigh evidence or judge witness credibility. *Mann v. State*, 895 N.E.2d 119, 121 (Ind. Ct. App. 2008). We affirm the conviction if the probative evidence and reasonable inferences drawn from the evidence could have allowed a

reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id*.

[27] To convict Morris of aggravated battery as charged, the State was required to prove beyond a reasonable doubt that Morris knowingly or intentionally inflicted injury on Yarber that created a substantial risk of death. Ind. Code § 35-42-2-1.5. Morris's sole challenge on appeal to the sufficiency of the evidence is that the State failed to prove that Yarber's injuries created a substantial risk of death.

[28] To determine whether there was a substantial risk of death, this court looks to the observable facts, including the nature of the injury and the treatment provided. *Oeth v. State*, 775 N.E.2d 696, 702 (Ind. Ct. App. 2002), *trans. denied*. Here, the evidence was that Morris kicked and stomped on Yarber, which broke one of her ribs and resulted in a collapsed lung. Dr. Holt testified that the injury was serious, could lead to cardiovascular collapse, and that until the time that the chest tube was inserted to re-expand her lung, her life was at risk. *Tr.* at 352, 357, 369-70. Dr. Holt agreed that Yarber's condition required immediate treatment to insert a chest tube. Yarber remained in the intensive care unit for three days.

[29] Morris points to Dr. Holt's testimony that Yarber was not in danger of dying in the emergency room, her lung was re-expanded, such that her condition was resolved within six or seven hours, and she had no further risk of serious injury at that point. The pertinent inquiry, however, is not whether there was a

substantial risk of death as she was receiving or after she received medical treatment. It is whether, when Morris injured her, she suffered an injury that created a substantial risk of death. The evidence was sufficient from which the factfinder could conclude that Morris inflicted injuries upon Yarber that created a substantial risk of death. *See Oeth*, 775 N.E.2d at 702 (victim's injury created substantial risk of death where she was struck by hatchet to back of her head, had profuse bleeding, lost consciousness and required stitches); *Beanblossom v. State,* 530 N.E.2d 741, 742-43 (Ind. 1988) (victim's injury created substantial risk of death where he received a blow to the back of the head, which was strong enough to knock him down to his hands and knees and cause him to remain in semiconscious state for a short period of time).

[30] Affirmed.

[31] Robb, J., and Barnes, J., concur.