


FILED

Feb 25 2025, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Marcus A. Minor,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 25, 2025

Court of Appeals Case No.
24A-CR-895

Appeal from the
Marion Superior Court

The Honorable
James B. Osborn, Judge

Trial Court Cause No.
49D21-2102-MR-4074

**Crone, Senior Judge.**

## Statement of the Case

[1] Marcus A. Minor appeals from his convictions of murder and attempted murder. He contends that two separate instances of ex parte communication, one by the bailiff, and the other by the trial court, constitute reversible error. He additionally challenges the court's ruling excluding a portion of an expert witness' testimony under Evidence Rules 702 and 704. And he argues that all of the errors, taken together, cumulatively establish reversible error. After reviewing the record, we conclude that none of the errors, taken alone or cumulatively, rise to the level of reversible error. Consequently, we affirm.

## Facts and Procedural History

[2] Melissa Smith and her son Austin lived in a house known by many as a drug house. Those who frequented the house referred to it as "Mama's house." Tr. Vol. 3, p. 195. At some point, Minor, who was known as "Psycho," and Marcello Snell, who was known as "Cello," took over Mama's house and began selling and manufacturing drugs there.

[3] On January 11, 2021, Austin invited Cassie Rugenstein over to the house to use drugs he had stolen from Psycho. Nearly everyone in the house was high, but

Cassie remembered seeing Psycho, who was in an aggressive mood, cooking crack on the stovetop in a pan. Cassie left in the morning on January 12. Austin had bruises and marks on him when Cassie returned later on that day. Austin and Cassie used drugs she bought from Psycho via CashApp. When she paid, she saw Psycho's given name was Marcus Minor.

[4] Melissa's daughter Amber McBride visited her mother once a week. On January 12, she visited Melissa and brought her two-year-old daughter, G.H. with her. Amber knew Minor as Psycho and would see him at Melissa's house whenever she visited. But Amber claimed she did not know him personally. When Amber visited her mother, she would stay for a couple of hours.

[5] On that day, Amber noticed Minor was there. She took her daughter, who was in a car seat, into Melissa's bedroom and sat on the bed. Amber heard and saw Melissa and Minor argue. Minor claimed that Melissa was stealing his drugs and that if the drugs were not returned, "he was going to kill everybody." *Id.* at 158. During that argument, Minor called someone, presumably Cello, to "have everybody killed." *Id.* at 160.

[6] Melissa and Minor continued to argue about whether she had stolen drugs from him as she begged for him not to kill her. Amber joined the argument in defense of her mother and to beg for her own life as well. Minor and Cello were both armed and in Melissa's bedroom. Amber saw Minor holding a gun as he shot her mother. Amber saw Minor and Cello shoot at her. Melissa suffered nine gunshot wounds, and Amber was shot eighteen times before she

blacked out. At some point after Austin became involved in the mêlée, he suffered nine gunshot wounds. Amber called 911 after the shooting stopped. Amber survived her injuries, but Melissa and Austin died.

[7] Officers responded to Melissa's house after hearing a report that a person was shot. Once there, officers discovered Austin, Melissa, and Amber suffering from gunshot wounds. Officers interviewed Amber the day after the shooting and showed her a photo array. Amber selected Minor's photograph from the array. In an interview a few days later, Amber, who was more alert and awake, again identified Minor as the person who shot her and her mother.

[8] Minor was charged with murdering Melissa and Austin and attempting to murder Amber. As part of Minor's defense, he called Dr. Kimberley McClure as an expert in eyewitness identification. The State successfully challenged Minor's attempt to have McClure testify that Amber's identification of him was unreliable. The trial court concluded that McClure could "testify as to factors that can cause unreliability, and that's fine, but she can't draw the ultimate conclusion with regard to [Amber]." Tr. Vol. 2, p. 136-37.

[9] When Amber testified at trial, she acknowledged that she suffered from PTSD, an intellectual learning disability, ADHD, depression, anxiety, and schizoaffective disorder. When questioned about whether she had issues with her memory, she responded, "Sometimes. Not all the time." Tr. Vol. 3, p. 146. She said, "Just like little stuff. I can't really explain what stuff I would have trouble with, but it—it's not something that's a big deal." *Id.* Amber agreed

that she remembered "big events in [her] life" and said she remembered people "by face." *Id.* Amber was fully cross-examined about aspects of her ability to remember people and events.

[10] McClure testified that experts in her field look at estimator and system variables to determine the reliability of eyewitness identification. Estimator variables are things that are out of our control. Those are things that make a person's memory less reliable, such as observing something in low light, or seeing something without wearing needed corrective eyewear. System variables are things that can be controlled. And experts have devised strategies for preserving an eyewitness' identification in a reliable way. Those things include strategies for who presents the photo array to the eyewitness and how to interview the eyewitness.

[11] McClure reviewed Amber's deposition, statements to law enforcement officers, medical records, and 911 call. She testified that there were a number of estimator variables in Amber's identification, such as the violence of the event, the presence of a weapon, the high stress, Amber's intellectual developmental delay, poor eyesight, and schizoaffective disorder. She also discussed how post-event information, such as discussing the event with police officers, attorneys, friends, family members, and reading social media, which are separate from the experience, become embedded in the eyewitness' recollection of the event. She further explained that the "lack of unbiased lineup instructions" before Amber identified Minor at the hospital was a system variable. Tr. Vol. 4, p. 147.

[12] Minor's counsel made an offer of proof outside the presence of the jury. Counsel elicited McClure's opinion "as to the probative nature or the reliability of [Amber's] identification[.]" *Id.* at 159. McClure opined, "I think there are sufficient estimator and system variables that we know through the science and anecdotal information that impact witnesses' memory that this witness statement is unreliable." *Id.*

[13] The jury retired to the jury room for deliberations at the close of the evidence. The bailiff retrieved the evidence to be sent back to the jury room. After the bailiff placed the materials in the room, the jurors asked if they could have the bodycam recording depicting what officers saw and heard upon arriving at Melissa's home after the shooting. The bailiff told the jurors, "No." *Id.* at 223, 226. The bailiff did not tell the trial court about the jurors' question.

[14] Around two hours into deliberations, the jury sent a note to the trial court, which read:

> After about two hours of deliberation, we are at an almost perfect split decision/standstill when it comes to our decision. Is there procedural or experiencial [sic] advice to charge us with to try and drive towards a consensus? The sheer lack of quality information in this case has been the major issue.

Appellant's App. Conf. Vol. III, p. 93. The court called Minor and counsel into the court room, read the juror question, and agreed to instruct the jury to continue deliberating.

[15] Sometime later, the jury sent another question to the court stating and asking: "We have reached a unanimous decision/verdict on two of the four counts, but are still not unanimous in the other two. One is very much deadlocked. Would you like for us to consider additional discussion?" *Id.* at 92. There is no transcription showing that the trial court consulted with the parties before responding, "Yes. Keep deliberating." *Id.* And, consequently, there is no record of Minor objecting to the court's response.

[16] At the conclusion of deliberations, the jury found Minor guilty of Melissa's murder, Amber's attempted murder, and not guilty of Austin's murder.

[17] After the trial, the jurors informed the trial court that they had requested the bodycam recording at the start of their deliberations, but the bailiff had told them no. The court held a hearing on the matter. The bailiff testified about the interaction. And the court summed up the interaction as the bailiff believing that the jury wanted to watch the bodycam recording in the jury room, because there was a television in the room, instead of in open court. The court agreed that the bailiff should have had a juror write the request down on a piece of paper to present to the court and the parties. And the court said, "[h]ad that been done, we would have brought them into the courtroom, as I've done on other cases numerous times, and replayed video for them to watch. But that didn't happen." Tr. Vol. 4, p. 223. Minor's counsel ultimately moved to overturn the verdicts due to the interaction's possible effect on the verdicts. The court denied the motion and imposed an aggregate sentence of ninety-five years executed.

## Discussion and Decision

### I. Presence At All Crucial Stages of Criminal Proceedings

[18] Minor argues that his common law and constitutional rights to be present at all stages of a criminal proceeding were violated on two separate occasions during his trial; namely, once when the bailiff answered a jury question, and the second when the trial court answered the jury's second written question without him being present.

### A. Bailiff's Interaction With the Jury

[19] Minor argues he is entitled to reversal of his convictions because of the bailiff's interaction with the jury when he was not present. For this part of his claim, he acknowledges that he is not entitled to relief under Indiana Code section 34-36-1-6 (1998) because there was no disagreement among the jurors about any part of the testimony nor did they desire to be informed as to any point of law arising in the case at that point. Minor's claims here are based on common law and state and federal constitutional protections.

#### 1. Common Law

[20] In *Bouye v. State*, the Supreme Court noted that unlike the statutory protection, "the common law protection applies whenever jurors request *any* type of additional guidance from the court[.]" 699 N.E.2d 620, 628 (Ind. 1998). "[T]he proper procedure is for the judge to notify the parties so they may be present in court and informed of the court's proposed response to the jury *before* the judge ever communicates with the jury." *Id.* "When this procedure is not

followed, it is an *ex parte* communication and such communications between the judge and the jury without informing the defendant are forbidden." *Id.* "However, although an *ex parte* communication creates a presumption of error, such presumption is rebuttable and does not constitute per se grounds for reversal." *Id.* For example, "[w]hen the trial judge responds to the jury's request by denying it, any inference of prejudice is rebutted and any error is deemed harmless." *Id.*

[21] Indiana Code section 35-37-2-6(b) (1981) provides that after the jury retires to the jury room for deliberation, they are placed under the charge of an officer, or bailiff, who may not communicate with the jury except to ask if they have agreed on a verdict, or when ordered to do so by the court. "When communication between a bailiff and a jury occurs outside of the defendant's presence, there is a presumption of harm to the defendant that the State must rebut to avoid reversal." *Driver v. State*, 594 N.E.2d 488, 493 (Ind. Ct. App. 1992), *trans. denied*. "The State may, however, avoid reversal if we are satisfied that no harm or prejudice resulted from the communication." *Id.*

[22] "When the trial court has addressed the issue of improper communications, we do not reweigh its determinations as to the credibility of the witnesses." *Sowers v. State*, 988 N.E.2d 360, 368 (Ind. Ct. App. 2013) (quoting *Baxter v. State*, 727 N.E.2d 429, 435 (Ind. 2000), *reh'g denied*)), *reh'g granted on other grounds*. "Because this is a factual determination, it is subject to a clearly erroneous standard of review." *Id.*

[23]     In this case, as the bailiff was bringing the evidence in the jury room, the jurors asked the bailiff "if they could have" the bodycam recording. Tr. Vol. 4, p. 225. The bailiff responded, "no, you guys can't." *Id.* at 226. After the trial court became aware of the situation, the parties were notified, and the court established a record of what had transpired. At first, Minor's counsel "wasn't worried . . . [and] didn't think that it impacted the verdict." *Id.* at 224. But counsel ultimately moved to set aside the verdicts because: "We just can't know if this impacted the jury's verdict." *Id.* at 229.

[24]     Minor relies heavily upon this Court's decision in *State v. Winters*, 678 N.E.2d 405 (Ind. Ct. App. 1997). However, this Court's holding in *Winters*; namely that the statutory protection is triggered any time the jury requests to rehear testimony because that amounts to an inherent expression of disagreement or confusion about the evidence, was disapproved of in the Supreme Court's decision in *Bouye*. 699 N.E.2d at 627-28. And Minor has explicitly stated that he is not relying on the statute for relief.

[25]     As for Minor's common law claim, we have found no reversible error where the "bailiff did not talk about the facts of the case, further instruct the jury, or discuss substantive legal matters with the jury." *Farris v. State*, 732 N.E.2d 230, 235 (Ind. Ct. App. 2000). Here, the bailiff should not have communicated with the jury. However, the communication that occurred was a refusal of information. And we have held that an inference of prejudice is rebutted by evidence that the response to the request was a denial. *See Bouye*, 699 N.E.2d at 628. We acknowledge that the bailiff's response by saying "no" will not always

lead to a rebuttal of the inference of prejudice. In this case, based on the facts and circumstances before us, the inference of prejudice is rebutted. Consequently, we find that the error here does not require a reversal of Minor's convictions.

## 2. Constitutional Claims

[26] Minor claims violations of the Sixth Amendment of the federal constitution and article 1, sections 12 and 13 of the Indiana constitution. He claims that the bailiff's ex parte communication with the jury deprived him of the right to be present and heard at all critical stages of his trial.

[27] Our Supreme Court has concluded that for the purpose of the federal constitutional analysis "the burden of establishing that there is a critical stage in the first place falls on the defendant." *Hernandez v. State*, 761 N.E.2d 845, 850 (Ind. 2002). The Supreme Court's test for identifying a critical stage is "'whether the defendant is confronted with the intricacies of the law or the advocacy of the public prosecutor or prosecuting authorities.'" *Id.* (quoting *Dullen v. State*, 721 N.E.2d 241, 242 (Ind. 1999)).

[28] In addition to his argument under the Sixth Amendment, Minor contends that under the Fourteenth Amendment: "A defendant's presence 'is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence.'" Appellant's Br. p. 22 (quoting *U.S. v. Gagnon*, 470 U.S. 522, 526 (1985)). However, immediately prior to that quote, the United States Supreme Court said, "a defendant has a due process right to be present at a proceeding

'whenever his presence has a relation, reasonably substantial, to the [fullness] of his opportunity to defend against the charge.'" *Gagnon*, 470 U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)).

As for Indiana constitutional claims, the Supreme Court recognizes the existence of "'state constitutional protection for a defendant's right to be present when a jury makes a request for any additional guidance during deliberations.'" *Hernandez,* 761 N.E.2d at 853 (quoting *Stephenson v. State*, 742 N.E.2d 463, 492 (Ind. 2001)). "A denial of the right to be present during all critical stages of the proceedings, like the right to counsel at a critical stage, is a constitutional right that is subject to a harmless error analysis." *Id.*

We conclude that Minor has not carried his burden of establishing that the bailiff's communication with the jury by replying "no" to a request for the bodycam footage while she was placing evidence in the jury room before deliberations had begun in earnest triggered a critical stage where he was required to be present and heard. Minor argues that his "right to be present was triggered when the jury requested an important piece of evidence—the bodycam footage." Appellant's Br. p. 21. He contends that the footage was important "because it brought into question the reliability of McBride's identification of [him] as the person who shot her and Melissa." *Id.*

The Supreme Court, however, has made clear that,

> the danger of an *ex parte* communication is the extraneous influence the judge may have over the jury by his communications. When a judge refuses any communication, the

> danger of extraneous influence is eradicated. Therefore, contrary
> to the defendant's argument, the prohibition against *ex parte*
> communications is not designed to give the defendant an
> opportunity to provide the jury with more information that might
> benefit his case, but rather it is designed to prevent the jury from
> being improperly influenced by the judge.

*Bouye*, 699 N.E.2d at 628-29. Thus, to the extent Minor's argument appears to be that he was prejudiced or harmed by the missed opportunity to have the bodycam footage played for the jury a second time, that argument misses the mark according to *Bouye*. The injury prevented by the prohibition against ex parte communications is improper influence by the judge or, as here, the bailiff. And the court's comments indicating that had it known of the request, the jury would have seen the footage in open court, unfortunately, does nothing more than undercut its own judgment in addition to being superfluous. We review the impact of what happened, not what might have happened, had things gone differently. We find no error that rises to the level of reversible error here under the federal or Indiana constitutions.

### B. Jury's Second Note to the Trial Court

[32] Next, Minor contends that the court committed reversible error by engaging in ex parte communications with the jury. The jurors sent two questions to the court during deliberations. Minor's argument rests with the circumstances surrounding the second question.

[33] During deliberations, the jury informed and asked the trial court in a written note: "We have reached a unanimous decision/verdict on two of the four

counts, but are still not unanimous in the other two. One is very much deadlocked. Would you like for us to consider additional discussion?" Appellant's App. Conf. Vol. III, p. 92. There is no transcription showing the trial court consulted with the parties before responding, "Yes. Keep deliberating." *Id.* And there is no record of Minor objecting to the court's response.

[34] "When the jury directs a question to the trial court, the 'better practice [is] for the judge to [notify] the parties before sending his [or her] response to the jury.'" *Henri v. Curto*, 908 N.E.2d 196, 200-01 (Ind. 2009) (quoting *Rogers v. R.J. Reynolds Tobacco Co.*, 745 N.E.2d 793, 796 (Ind. 2001)). "If this procedure is not utilized, the resulting judge-to-jury ex parte communication creates a rebuttable presumption of error, but is not per se grounds for reversal." *Henri*, 908 N.E.2d at 201. "'In deciding whether the presumption of harm has been rebutted, we evaluate the nature of the communication to the jury and the effect it might have had upon a fair determination.'" *Id.* (quoting *Smith v. Convenience Store Distrib. Co.*, 583 N.E.2d 735, 738 (Ind. 1992)). "One significant factor in determining the effect of an ex parte communication upon the jury's decision-making is whether or not the court's response to the jury contained any new information regarding the facts or law of the case." *Henri*, 908 N.E.2d at 201.

[35] Here, the record shows that counsel received a text message from the court reporter indicating that the deliberating jury had another question. Tr. Vol. 4, p. 229 ("The second question that we got, I checked my text, was at 3 p.m.—or that's when the court reporter texted me to say there was a question. That

question was that they were unanimous on two counts and not hanging but couldn't come to a decision on the other two counts."). However, there is no record that the judge brought Minor and counsel into the courtroom to discuss the question and agree upon a response. And there is no record of an objection to the response given because there is no transcript.

[36] Better practice would have been to call Minor and counsel into the courtroom and establish a record of the second note from the jury and the discussions involving any response. But, looking at what we do know, the court's response did not contain any new information regarding the facts or law of the case. As such, we find that the presumption has been rebutted, and the error does not rise to the level of reversal.

[37] We recognize that this is an area that the Supreme Court has become more involved in by regulating trial courts' involvement with juries. But if the Supreme Court decides to overturn longstanding precedent, it is up to them to do so. We see the parties' concern. The bailiff should have had the jury submit the request in writing to the court. And the court should have made a record of the second note according to the guidelines set out in *Bouye*. But based on precedent, we find no error here that rises to the level of reversal.

## II. Exclusion of Expert's Testimony

[38] Minor argues that the trial court abused its discretion by excluding Dr. McClure's testimony about the reliability of Amber's testimony identifying Minor as the person who shot her and murdered her mother. He contends

McClure's testimony was admissible: (1) under Evidence Rules 702 and 704 because the rules "allow expert testimony based on opinion or otherwise that will help the jury determine a fact at issue[;]" and (2) "because it was [an] opinion on a question of fact." Appellant's Br. pp. 23, 26.

[39] "The decision to admit or exclude evidence at trial is within the trial court's discretion, and we afford it great deference on appeal." *Gee v. State*, 193 N.E.3d 1036, 1039 (Ind. Ct. App. 2022). "We review the trial court's decision regarding the admissibility of evidence for an abuse of discretion." *Id.* "An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it." *Id.*

[40] The trial court excluded McClure's proffered testimony that in her opinion "as to the probative nature or the reliability of [Amber's] identification[,] . . . [she thought] there are sufficient estimator and system variables that we know through the science and anecdotal information that impact witnesses' memory that this witness statement is unreliable." Tr. Vol. 4, p. 159. The trial court concluded that McClure could "testify as to factors that can cause unreliability, and that's fine, but she can't draw the ultimate conclusion with regard to [Amber]." Tr. Vol. 2, p. 136-37.

[41] Evidence Rule 702(a) provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine

a fact in issue." As for opinions on ultimate issues, Evidence Rule 704(a) provides that generally, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable just because it embraces an ultimate issue." But Evidence Rule 704(b) provides the exception to the general rule, that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

[42] Here, Minor's counsel cross-examined Amber at great length about her memory and her diagnoses. Minor's counsel also impeached Amber's testimony with portions of her deposition testimony. The jury heard Amber's 911 call in which she stated she did not know who shot her. And they heard Amber's comments to responding officers as reflected in the bodycam footage. McClure testified about the science of studying the reliability of eyewitness testimony. Her testimony educated the jury about estimator and system variables which can affect an eyewitness' identification of a suspect. And the jury heard Amber's testimony on cross-examination that she had "Googled" the incident, had discussed it with her friends and family members, and learned Minor's given name and saw his picture via various forms of media.

[43] But Minor argues that McClure should have been allowed to connect the dots for the jury and offer her opinion that Amber's identification was unreliable. We cannot agree.

In *Jimerson v. State*, 56 N.E.3d 117 (Ind. Ct. App. 2016), *trans. denied*, a panel of this Court examined cases which decided the propriety of the partial or complete restriction of expert testimony. *See*, *e.g.*, *Miller v. State*, 770 N.E.2d 763 (Ind. 2002) (complete exclusion of expert's testimony about coercive police interrogation and false or coerced confessions was reversible error; expert testimony which would have violated Rule 704(b) could be excluded through rulings on individualized objections); *Shelby v. State*, 986 N.E.2d 345 (Ind. Ct. App. 2013) (limitations on expert's testimony to generalized information about police interrogation tactics not reversible error where jury could use expert's testimony to apply to particular facts and circumstances of case), *trans. denied*; *Callis v. State*, 684 N.E.2d 233 (Ind. Ct. App. 1997) (expert testimony about coercive police interrogation and false confessions in the particular case excluded), *trans. denied*. The *Jimerson* court concluded that "an expert should not be invited to cross the line at which the jury can proceed without further aid." 56 N.E.3d at 123. The Court held,

> the jury had been given adequate information to apply its common knowledge and experience. Where a jury is able to apply concepts without further assistance, highlighting individual exchanges or vouching for the truth or falsity of particular evidence is invasive.

*Id.*

Despite these holdings, Minor claims that "McClure's opinion did not speak to whether [Amber] testified truthfully. The opinion only went to whether [Amber's] identification is reliable which is a question of fact." Appellant's Br.

p. 27.  However, McClure's opinion about the reliability of Amber's identification does invade the sole province of the jury to determine her credibility.  *See, Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) ("It is the fact-finder's role . . . to assess witness credibility . . . .").  In this case, Minor's defense strategy was to attack Amber's credibility via challenges to her memory and by evidence of the impact of certain factors—vision, educational challenges, mental health, traumatic experience—on the reliability of her identification.  It was for the jury, not McClure, to determine whether the estimator or system variables affected Amber's unequivocal identification of a person with whom she was familiar as the person who shot her and murdered her mother.  The trial court did not abuse its discretion in this way.

## III.  Cumulative Errors

[46]    Minor argues that the cumulative effect of the alleged errors made throughout his trial denied him of his due process right to a fair trial under the Fourteenth Amendment to the United States Constitution and his right to complete justice under article 1, section 12 of the Indiana constitution.  His argument is based on the Supreme Court's holding "'for the sake of argument, that under some circumstances the cumulative effect of trial errors may warrant reversal even if each might be deemed harmless in isolation,' but not where it has been 'clear in light of the evidence of guilt that no prejudice resulted from any of the erroneous rulings, individually, or cumulatively.'"  *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting *Hubbell v. State*, 754 N.E.2d 884, 895 (Ind. 2001)).

[47] Minor is "'entitled to a fair trial, not a perfect trial.'" *Id.* (quoting *Myers v. State*, 887 N.E.2d 170, 175 (Ind. Ct. App. 2008), *trans. denied*. Although there were imperfections in his trial—ex parte communications—those were isolated incidents and the imperfections did not permeate the trial. As we discussed above, while the record reflects that the *Bouye* procedure was not followed in those two instances, following longstanding precedent, we concluded that neither instance resulted in the jury receiving new information about the law or the facts of the case without Minor being present, and thus no reversible error. And the trial court did not err by excluding the portion of McClure's testimony which would have invaded the province of the jury by offering, in effect, an opinion on Amber's credibility. McClure's testimony provided the jury with the necessary tools with which to make its determination without McClure deciding the matter for them.

[48] Consequently, we conclude that Minor's trial, while not a perfect one, was a fair trial. And the imperfections did not rise to the level of reversible error based on precedent.

## Conclusion

[49] In light of the foregoing, we affirm the judgment of the trial court.

[50] Affirmed.

Bailey, J., and Brown, J., concur.

ATTORNEY FOR APPELLANT

Talisha R. Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana